With the attorneys who are going to make a presentation this morning, please approach the podium and identify yourselves and the party you represent. Good morning, Your Honor. Christopher Carmichael on behalf of the First Plaintiff, Duane Kiles. Good morning. Vicki Rogers on behalf of Appellant Calvin Hollins. Good morning, Your Honors. Carrie Maloney Layton on behalf of the City of Chicago. Good morning. We have scheduled this 30 minutes for this hearing with the time being divided equally between defendant and appellate, I mean, appellant and appellee. And have you decided how you're going to divide your time? I think we've been divided. Okay. All right. Now there is an open motion here regarding the supplemental authority. We've seen the Geiger case. We've considered it. So the party is going to address that because I understand you did not file a new brief. So you may address it in your arguments. All right. With that, we may proceed. Good morning, Your Honor. Good morning. I please the Court. My name is Christopher Carmichael. I represent the appellant, Duane Kiles. And this morning I will be addressing two of the issues while my co-counsel will address the third. I will address the jury instructions and the evidentiary issues, and she will address the sentencing issue. The jury instructions in this case did not fully, fairly, and comprehensively instruct the jury as to the relevant legal principles. There was a corporate liability instruction that misled the jury. That corporate instruction should not have been given. The instruction doesn't apply here. The committee notes give two examples in which the instruction applies. It applies when an individual is jointly charged with a corporation. That was not true here. The corporation was dropped from the Third Amendment petition. So the corporation was not a party. That was not applicable. The other possibility is where the individual is charged with conduct committed on behalf of a corporate employer. That, again, was not true here. The individuals here were charged with personally, knowingly, and willfully violating the order on their own. But were they not acting on behalf of the corporation? The evidence in the arguments were that they were acting on their own behalf and that they violated the order knowingly. Well, they were acting on their own behalf because they were the owners of the corporation, but the corporation was the owner of business. That's correct. So where are we? Well, they weren't charged with committing conduct on behalf of the corporate employer, although they may have been. Again, it's not part of the charge, but isn't it the case that with the evidence that was provided, which included the ownership interest of the two defendants, that it was clear that somebody could interpret their acts as being beneficial to the corporation and are done on behalf of the corporation. And so that instruction would then be pertinent to their behavior under those circumstances. It wouldn't be pertinent in this particular instance, Your Honor, because they weren't actually charged with that nature of committing acts on behalf of the corporation that then lended themselves to personal liability. The difference here is they were charged and alleged to have, although they did commit acts and the corporation issue did come up, it was the charge was them personally. In the absence of that, wouldn't it create the possibility of some mischievous argument that what are you talking about here? This was the corporation. They didn't have any personal interest in this, yada, yada. First of all, I think it would still apply under the facts of this case, and I don't see the harm that would derive, even if you're right, from the instruction that was given. Two points, Your Honor. One is the parties addressed that exact issue during the jury instruction conference. So the issue came up about, and the basis for the instruction was not that it applied, but the basis for the instruction was that there was going to be some mischief because someone was going to argue that the corporation somehow committed an act and they had no idea. The parties said, number one, we're not going to argue that, so it's not an issue. And number two, if you think we're going to argue that, order us not to. But couldn't the jury come up with that same determination without the benefit of an argument, and doesn't the instruction properly take that out of consideration? It's our view, Your Honor, that the instruction, if the argument wasn't made, that somehow they weren't liable because there was a corporate act and not their act, that the instruction in the absence of that confused the jury. Explain to me the nature of the confusion that occurred in your mind. Well, the nature of the confusion, there was an attempt to submit evidence that corporate actors may have acted without the knowledge of or agreement of the respondents. So a corporate actor, an agent over here, committed some act that would have violated the order. So there was an attempt to make that then attributable to the respondents as opposed to an act that the respondents took themselves or were aware of. So there's the confusion that arises because we're trying to get. Wasn't there evidence that after the imposition of the court order, that there was a discussion with at least one of the defendants about what we have to do to relieve ourselves of the bar for the use of the second floor? So weren't they, I mean, really, weren't you then in a situation where there was no reasonable basis for saying that some other corporate actor was the decision maker under these circumstances? Well, that wasn't what they were saying. The point that was made in that testimony I think you're referring to is that the actors took action themselves to make sure that the order was followed as to their understanding of the order. So they took action to bar people from the mezzanine and second floor as they understood the order to prohibit. That's actually a different issue. Well, and the issue became is whether or not an agent may have done something that they shouldn't have done. And that's where the instruction becomes problematic is because if an agent did something they should not have done and then that conduct is then attributable to them as if they're responsible for the agent through the corporation, the jury gets very confused there. The second instruction that should have, there was a second instruction error, and the instruction that should have been given was a willfulness instruction. It is the key element of this crime. There's only two elements to contempt. The first is that there's an order that states what the prohibitive conduct and the second is that the person willfully violated. And that willfulness is the key element of this crime. It's the essential element. There's an IPI on point as to willfulness. Wasn't that resisted? The IPI? Yeah. The entirety of the IPI was. The entirety of the IPI is not applicable, but there was a request to provide a definition of willfulness. You're talking about the jury's request or part of the respondent's? On the part of the respondent's and the jury requested as well. Didn't the respondent say they didn't want the willfulness order? They did not want the entirety of the IPI that was being offered because not all of that was applicable. Only a part of that instruction was applicable. What did they submit? They submitted a definition of willfulness from blacks. So choosing to not use the definition of willfulness that has been approved by the Supreme Court in the IPI instruction, not even suggesting that they excise and redact the arguably irrelevant parts of the instruction and use the definition that Illinois law has accepted as to willfulness, you're now raising that somehow having resisted it, that the court erred in not giving it. The court said that no instruction should be given. No willfulness instruction should be given. But we have an IPI. You do. That the respondents or the defendants didn't want given. Probably for a very good reason because in the absence of a willfulness instruction, people commonly might associate the word willfulness with something approaching intent. And, of course, the instruction that's been approved in the state of Illinois defines willfulness in a manner that is much closer to knowingly. And so giving the instruction that Illinois has approved could be perceived by a jury reasonably as lowering the burden of the prosecuting authority. Wouldn't you agree? I would agree, Your Honor, that they resisted part of the instruction because it did mention knowingly, and that was inapplicable here. The issue was willfulness. So they did offer the alternative of lax, which did not correctly state the law. But even in the absence of them offering the correct instruction, this court has the power to review that instruction and find error. The court has an independent duty to see that the jury is properly instructed. The trial court here did not think any instruction was necessary. And after that, the jury asked a specific question about what does willfulness mean. And when a question is asked in deliberations, it should be at least given the same consideration as the original instruction, if not possibly more, as the jury is now evidencing some question. So at that point, would it have been appropriate to give the IPI instruction that the defendants had resisted in the instruction conference? A portion of that instruction, not the complete instruction, because the complete instruction would also mislead the jury because it would not apply. But you're basically saying that the IPI instruction is misleading and should not be given. No, I'm saying that part of the instruction, and I think it's per the terms of the instruction itself, it says some subparts apply, some parts don't, depending on the nature of the offense and what the mens rea is. Here, the willfully portion of that instruction should have been given. The knowingly portion, the issue is not knowingly here, it's willfulness is the element of the crime. Certain instructions are essential, and they go to the elements of the crime, and waiver is not enforced against such essential instructions. In addition, the waiver doctrine here, the purpose of it would not be properly fulfilled because the court said it wouldn't have corrected the error. It didn't think that any instruction was necessary, and the court had the instruction in front of it as well. An instruction was requested, although it was not the correct statement of the law, the court again indicated it did not think that anything, any further information on waiver was needed. So the jury was confused, and the jury should have received some clarification of what waiver is. And here, coupled with the instruction that we believe was improperly given on the corporate liability, it confused the jury into convicting the defendants for acts other than their own personal acts. This was not harmless error. These instructions affected the outcome. There was conflicting evidence, not overwhelming evidence, as to what the order meant. There was evidence of attempts to comply, and here the instructions made the difference. Well, of course, the Supreme Court has said that it was unambiguous, but also said that the argument could be raised as to whether the violation was willful. That's correct, Your Honor. The Supreme Court indicated that the confusion as to what the order meant is relevant to the respondent's intent. There was key evidence on that point, which is our other point of error that I was going to speak about, was excluded. There was the judge's half-sheet, a letter from the attorney, and the judge's testimony. Now, the judge's half-sheet and the letter are contemporaneous evidence. They're extremely powerful evidence because they're black-and-white writings at the time. Nobody can say later that they meant something different. The jury can read them for themselves and put themselves in the place and understand why the respondents acted the way they did. They're inherently trustworthy, and they should not have been excluded. They show why the respondents' belief that the order meant what they believed it did was reasonable and why their acts weren't willful. And so this goes very much to the heart of the main issue. Weren't the two defendants in different positions factually in regard to that letter, even if they were, even if it had been admitted? I'm not clear on that point, Your Honor, but I believe, well, obviously it was Mr. Kiles was most directly affected, but I believe Mr. Hollins was also informed of its content. Where? I'm not sure offhand. I know it was obviously Mr. Kiles, he retained the attorney, and so he was directly informed of the information and spoke with the actual attorney who asked the other attorney to be substituted in for a temporary time period. Was there any evidence that Mr. Hollins either saw the letter or the half sheet or communicated with the attorneys or Kiles about that evidence? I believe, Your Honor, there was some evidence of him communicating with Mr. Kiles on that point. I don't know if he saw the letter or the half sheet personally. The evidence was excluded based on the theory that it was hearsay, although, oddly, testimony was allowed about the evidence. The evidence was not hearsay because it was offered for mental state. The half sheet is a court record, so it's independently admissible. And the other reason it was excluded is possible confusion, but there was actually an instruction, I believe, given to the jury to explain to them what the difference between the half sheet and the order is, and if there was some further instruction that was needed, that could have been given, but confusion wasn't a basis to completely exclude this evidence. It's very strong evidence. They could see the judge's handwriting right there as to the judge's understanding and understand why the jury or understand why the respondents then would act the way they would act. And the difference is material here because the documents themselves are worth far more than the words about them, much like a picture might be in a personal injury case. Did Royce basically testify that his reliance on the letter and the half sheet led him to tell Mr. Kiles that there was an inconsistency between the order and the half sheet and Predragast's letter and advised him only to vacate the VIP section? I believe that is what Mr. Royce said. Yeah. So even if it was an abuse of discretion, which is the standard, where is the harm when all you're really talking about is the jury's ability to see that half sheet that Mr. Royce testified about? Well, the harm is because the half sheet and the letter are like a picture of an accident or any other demonstrative evidence that shows you actually what happened as opposed to someone describing it. They could actually see the judge's handwriting on there saying second floor VIP and mezzanine. It's very important to understand why the belief was reasonable and it helps the jury to understand why that's reasonable. You have the lawyers testifying as to that and you have the double-barreled issue of, first of all, the exclusion being judged under the abuse of discretion standard and then even if it's found to be an abuse of discretion, then applying whether it was harmless beyond a reasonable doubt where it certainly comes into play whether the jury otherwise heard about that through the testimony of the lawyer. Testimony of an interested witness long after the fact is certainly not as powerful as the actual document that was created at the time. Was there any challenge to the fact that the half sheet and letter existed? No, there was not. Not as to their existence, but obviously as to their effect, there was significant challenge. But the operative consideration, of course, would be whether Mr. Kiles was entitled to rely upon the advice of his attorney, whatever the attorney's advice was based upon, where he testified that he told Mr. Kiles that it only affected the VIP section based upon his reading of the Prendergast letter and his reading of the half sheet and its purported conflict with the court order. Correct? It's correct that he testified to those things, but obviously his testimony is strongly bolstered and importantly bolstered in this case by the actual documents as opposed to him saying something exists, just like someone standing up here and telling you something happened as opposed to you being able to read it and see it for yourself. It's not your best evidence rule, but you're saying this would be better evidence that would make it more reasonable or supplant what your position is. Yes, and I think that's one of the reasons it was excluded is because someone thought it would create confusion. Well, that's in part why it is admissible, is because it was admissible to show confusion. Yes, so if the parties could show there was confusion at the time and it might show confusion to the jury, that's very strong evidence that their actions were not willful. Your Honors, I reserve some time for rebuttal and let my co-counsel. Thank you. Ms. Rogers. Good morning. Good morning. We adopt the position and the arguments as presented by Court Appellant Kiles. My focus is the sentencing error. The two-year sentence for not fixing a roof that did not fall or injure anyone was excessive and unheard of in this state. The court order was to close the second floor because the roof truss and the skybox might not be safe. The trial was for indirect contempt for violating that order to not close that second floor. They were found guilty of contempt for violating that order not closing the second floor. But the two-year sentence was imposed based on the 21 deaths that occurred in the court, that occurred in the club on February of 2003. This court has already found that the element of proximate cause is lacking because the roof truss was not the problem, was not the cause of the individuals leaving the club. The failure to close the second floor was not the proximate cause of the deaths and injuries. The introduction and considerations of the deaths as a factor at sentencing was improper since the deaths were not related to the problem. It was not a proper sentencing factor under the statutory guidelines and case law. And the two-year prison sentence is excessive. What statutory guidelines are you referring to? The general statutory guidelines that talk about what's aggravation and mitigation in the code and the case law. Because this is not a statutory offense. Correct. So you're talking about general concepts of aggravation and mitigation. Yes, general concepts. And also what the case law says, such as Geiger, as to what can be considered proper. And it's just excessive in the light of the contempt finding in this great case. Here we have a situation where the state. So if we were to agree with you, are you seeking that it be remanded for sentencing, assuming that is the only error we find? Or are you suggesting that if we find no other error, that we should impose a sentence? Well, this has been going to court over ten years now, Your Honor. And our preference is that you modify the sentence to an appropriate fine, as has been in all building court cases in Illinois, where there has been no injury that has resulted from the violation. That would be our preference, that a fine is appropriate here, and this court has the authority to do that, if there is no other issues or problems, issues that need to be addressed at the lower level. The state charged the appellants with involuntary manslaughter in 2003. The state at trial wanted to introduce evidence regarding the building court order and the unsafe roof truss. The trial court in this court back in 2008 said no. The violation of the court order and the roof truss were not related to the deaths. It was not foreseeable that operating a club in violation of that court order would result in deaths and injuries when you have a fight, pepper spray, and a scampi for the door. Well, I'm not arguing with the ultimate conclusion that you're making, but, I mean, theoretically, the violation of the court order could have resulted in a thousand people dying if the roof trusses were indeed, as the city felt, unsafe and their concern about the entire floor collapsing were well founded when a thousand people were on a floor that the court had ordered not be occupied. That's correct, but that's not what happened. No, I don't dispute that there's no proximate cause between the injury in this case and the violation of the court order, but it may be overstating it to say that there was potentially, I mean, potentially the harm for violating the court order would have been far more severe than the tragedy that occurred in this case. Yes, Your Honor, but, again, we have building court orders for unsafe condition and property all the time, and a sentence of two years in prison has never been imposed when, again, that violation does not cause any harm or injury to anyone. Ms. Rogers, let me follow up on my colleague there, because in reading the briefs before us, the one argument that I think the city makes directly on this point is on page 43 where the city says, Respondents' contempt of the orders most certainly caused the deaths and injuries. Had respondents not disobeyed them, no one would have been on the building's second floor and no one would have died or suffered injury. How do you respond to that factually and legally? Factually, that statement is illegal. Factually, their statement may be true because there was death and injuries, but if the club wasn't open, the first floor was still open. You could have still had an incident where people would have stampeded for the door and you would have had the same problem, because the stampede and the injuries came at the first floor level when they were trying to get out the door. You could have a situation where, and that factually may be true, but you could still have a number of factors and circumstances where you could have had the same scenario and the club, even if the club was closed. And legally we know it's not true because that's not the definition of proximate cause. If there are independent events, which you had in this case, that caused the actual harm, then you cannot have... It's like here they're sort of arguing half of proximate cause. They don't have all of proximate cause, so they want to argue half of it. Correct. And you would suggest that the earlier holding of this court would prevent that sort of argument from being made. Definitely. This court held that the involuntary manslaughter, if the building court order and the roof truss situation was not related or relevant at the involuntary manslaughter trial, then it cannot be relevant at the sentencing hearing for the contempt on the order of the building court, contempt for that building court violation. It's not possible. In the recent Illinois Supreme Court case of People v. Geiger, they talked about four factors that the court should look at when you're imposing a contempt sentence. In that case, of course, it was a contempt for a murder case. In this case, it's a building court violation. But the four factors, when you look at them and apply them here, you have a situation where the sentence is excessive. The extent of the willful and deliberate defiance of the court order. In this case, there was no willful and deliberate defiance. Even though the Illinois Supreme Court in this case said that the order was clear, they also made it clear that the ambiguities in this case regarding the half sheet, the instructions they were given from their lawyer, and the conversations even in the housing court. Excuse me for the interruption, but as to the sentence, you're saying that it's excessive because it was based upon information that should not have been considered by the judge in terms of the deaths that occurred because there's no causation relationship. Correct. Between the code violations and the tragedy where all these people lost their lives. Correct. That is our position. If that were a proper consideration, are you making the argument that two years would be excessive for all of the, you know, if the judge was properly taking that into consideration? I am. Because under Geiger, two years is definitely excessive. It's excessive because, one, no one has ever received in this state a prison sentence for a building code violation where there was no injuries involved in the violation. And, two, when you look at the four factors in Geiger, my client's, it's clear that my client's actions do not warrant anything other than a fine, as has been given in the past. But you're not really arguing, and it's not critical to your argument, to suggest that if indeed the injuries and deaths occurred because of exactly the worry that led to the order closing it, that two years would be excessive, are you? No, Your Honor. Okay. I'm not saying that. That's what we're trying to clarify. No, no, Your Honor. I'm not saying that it's, it would be appropriate if you think about it. We understand the argument that the violation of the order was not the proximate cause of the tragic deaths. And the excessiveness of the sentence is to be judged in regard to the violation of the order without consideration of the deaths that occurred because the deaths were not proximately related to the violation of the order. Correct. And also because when you look at the facts in this case, you do not have a situation where a prison sentence is warranted. My clients had more than five more, approximately nine individuals who testified at the sentencing hearing as to their good reputation in the community. The Roof Trust never failed and hurt anyone. No one was injured because of the Roof Trust. In fact, they're still standing. We're talking about a period of time of only seven months in which they were in court, and they were going back and forth, constantly going to court at all times, every court appearance. Their lawyer was there, and they were working to try to clear up the violation. So when you take all those in consideration for the building court order and for the contempt and put it with Geiger, you have a situation where the two-year sentence is not warranted because it's not the proximate cause and because looking at the facts of everything that was involved in this case, there was the sentence would be considered excessive. Since this court has held that my clients cannot be held responsible for the tragedy that occurred on February 2003, the sentence here is another attempt by the city to do what they could not do. Therefore, we ask that this court vacate the two-year sentence. Thank you. Thank you. Ms. Maloney. May it please the Court. No. Your Honors, the Illinois Supreme Court has now settled that the building court orders in this case were clear and that sufficient evidence amply supported that respondents understood those orders and willfully violated them. In light of that decision, none of the arguments that respondents are pressing for the building court order today are worthy of sending the case back for a new trial. If that's the case, why were they tried again at all? Why wasn't judgment entered by the Supreme Court? These issues were not briefed by the Supreme Court. The Supreme Court considered simply whether the evidence supported the convictions, but no briefing was had regarding these evidentiary questions or the instructions. So the Court was, of course, as this Court is aware, the Supreme Court doesn't decide cases typically that this Court to consider. But in light of what the Supreme Court said in the opinion, it becomes clear that the issues that are being pressed here would not have affected the outcome. And therefore, at the very least, no new trial is warranted because there is no prejudice from any of these issues. Now, of course, we make arguments on the merits as well of each of those. But that's our position. In addition, in light of another Supreme Court case, the Geiger case, we contend that the sentencing court here considered the correct factors and it was well within the range of its discretion and not an abuse of its discretion to select a two-year sentence. I want to briefly address each of the issues raised. First, with respect to the evidentiary issues, the half sheet and the printer guest letter, neither one was an abuse of discretion. Neither one added anything to the defense that was not already before the jury. And with respect to the printer guest letter, it was hearsay and therefore not an abuse of discretion to keep out. And with respect to the half sheet, there was a potential for making a confusing argument that that was the order that controlled as opposed to the court's. It certainly wouldn't be hearsay if it were admissible only to show the mental state of people who read it. Well, it was the mental. Correct. If it was used for another purpose besides the truth of the matter asserted, it would not be hearsay. But it was not being offered to show Mr. Printergast. But you did have Mr. Royce saying that he thought that the letter created a question. There was a question about the import of the original order. And whether he tried to clarify that or he didn't try to clarify that, he communicated that feeling of possible ambiguity to at least Mr. Kiles. Correct, Your Honor. But there was no reason for the jury to look at the words on the letter to understand that defense. I was just responding to your hearsay argument, which I think, as we all know, it's only hearsay if it's offered for the truth. And things that are not offered for the truth may be relevant for other purposes, including what the hearer felt or thought based upon what the hearer was told about what the out-of-court statement said. Correct, Your Honor. But it wasn't necessary for that purpose. It would be cumulative for that purpose. Well, that's a different argument, isn't it, than the one you made? Correct. But, again, Mr. Royce's testimony was not, I mean, what his state of mind is, it wasn't the ultimate question for the jury. No, but Mr. Kiles was. Mr. Kiles was. And Mr. Royce testified that he told Mr. Kiles that he went to look at the half sheet because of what that letter said. Mr. Printergast, who wrote the letter, testified, I wrote a letter because I thought the VIP rooms only were closed. Mr. Royce said, I received that letter, and because of that letter, I went to look at the half sheet. After I looked at the half sheet, I thought only the VIP rooms were closed. The letter and the half sheet said the same thing. And then I told Mr. Kiles that. All that was before the jury. It did not need to see the letter or the words on the half sheet to understand that defense. So you feel that it's not an abuse of discretion under those circumstances? And even if, I assume, even if it was an abuse of discretion, given the testimony of Mr. Kiles? I'm not sure that I'm in agreement with Mr. Royce as to all of that. It's a harmless error. Correct, Your Honor. And it would not have made a difference in light of what the Supreme Court has now held. Because what the Supreme Court said in paragraph 71, actually, if you look at the opinion, the Supreme Court sets out word for word what the letter says and what the half sheet says in paragraphs 10 and 14 of its opinion. And in paragraph 71, it goes on to say, when it's talking about what Mr. Royce did, it says, because Prendergast's letter stated only that the mezzanine had been closed, Mr. Royce went to check the half sheet. And then after checking the half sheet, Royce told Kiles the order was different from the letter, and the letter and the half sheet said this were consistent with each other and said the same thing. In other words, the Supreme Court is considering exactly what that letter said and exactly that the letter said the same thing as the half sheet, but goes on to conclude that did not make the language of the order unclear. But aren't you conflating the issue of whether the order was ambiguous or not, which is what really they were responding to, rather than the reserved question of the proof of willfulness? Well, Your Honor, that was certainly what the opinion was about, whether the order was clear. And it went on to hold in addition that the evidence amply supported that respondents knew. And what we're suggesting is that what that letter said and what that half sheet said do not overcome what the Supreme Court has already found sufficient to uphold that respondents knew the order's true scope and willfully violated them. Moreover, the Supreme Court, don't forget, additionally held that the convictions were supportable if only on the basis that the orders definitely closed the VIP rooms, yet respondents knew that and willfully violated that command of the building court. And neither the half sheet nor the Prendergast letter would have absolutely any impact on overcoming that holding of the Supreme Court. There's evidence that's sufficient here to convict because respondents admit they knew the orders were supposed to close the VIP rooms. So that adds to your harmless error. That absolutely adds to our harmless error. In light of what the Supreme Court's held, there's no need for a new trial based on these two pieces of evidence. Would you like to address the sentencing? I would like to address the sentencing. Would the Court prefer I return to that next? I just want to know if you want to address it. Absolutely, Your Honor. With respect to the sentencing, the Geiger opinion makes clear that among the factors a sentencing court can consider are that the consequences of the contempt, the extent of the contempt, and the deterrent effect that the sentence will have for future cases. Let me ask you, you used the word there are consequences, which comes from the Geiger case. Isn't that equivalent to saying that the consequence here of the code violation was the death of all these people? Is that what you're trying to say? Well, Your Honor, I think we Because if you are, that's not what the Supreme Court said in terms of proximate cause, the legal standard. Well, our position, Your Honor, is that there is a but, that respondents' contempt was a but for cause. Granted, not approximate cause. That's just part of the equation. Correct. The Supreme Court does not say but for versus proximate in the Geiger case. That's an almost pregnant kind of argument you're making here. I'm sorry, I don't know. What I mean is you're just, you're saying part of it. It's not, you know, you don't have both sides of the proximate cause issue covered here by the facts of this case. That's already been determined by the Supreme Court. That's taken out of our hands. So if that's the case, then how can we say that the deaths of these people, which would have been a part of the Geiger case, would have been a part of the Geiger case? Which was considered by the judge in sentencing was a consequence of the code violations. If you don't have proximate cause. That's the legal argument that I'm struggling to understand. Okay. Well, to try to address your point, the question for this court is whether it was inappropriate for the sentencing court to consider that because the respondents were violating the court order, people died. And that's the question for the court. Now, whether that was the proximate cause in the criminal case, where of course there's a different standard, it's beyond a reasonable doubt. Whether that was the proximate cause and whether they could be liable for the deaths in a manslaughter case is completely a separate question from whether a sentencing court can consider that. But for the fact that respondents were operating that second floor, no one would have been present on the second floor and no one would have died. Respondents, it's not as though they had a different mindset. If the people were, as counsel argued, on the first floor and the same incident arose and the same pepper spray was used, what would have been the difference? Or put another way, if they were brought in for contempt the day before this tragedy occurred and the evidence was that they had willfully violated the order to not occupy the second floor, and nobody had ever been up there on the date of this accident, but had been up there on an earlier date. When nobody had an altercation and nobody had pepper spray, nobody had died. Would a two-year sentence be appropriate under those circumstances? Your Honor, we submit that it is within the trial court's discretion, based on a different set of facts, which Your Honor is positing, to reach a different conclusion or even the same conclusion. This court does not have to agree. But you're adopting facts which are arguably improper and abuse of discretion for the judge to have considered. We disagree, Your Honor, because it cannot be disputed that but for operating the second floor, no one would have been there and people died as a result. But for the fact that they were born, nothing would have happened either. But there's a difference between cause and fact and approximate cause. We're trying to focus on the legal aspect here. And the argument that the city makes in this regard, which allowed the judge to take these into consideration, seems a little attenuated in my judgment. Okay. Okay. Well, we respect that, Your Honor. What we submit is that it is not a question whether this court would have imposed the same sentence or whether this court would or — Well, the question is whether the court below considered and sentenced based upon something that they were not entitled to consider. Right. But what this — if you look at the transcript from the sentencing court, it said several things. It said the serious nature of the contempt, which could be taken to mean the fact that people died. It could be taken to mean that in building court, orders are entered for the purpose of protecting the public from the risk of death and injury from dangerous and hazardous conditions. Respondents ignored the court orders, therefore running the risk, knowingly. Running the risk, people could die or be injured. It's a serious matter to ignore that. And the trial court could properly have considered to vindicate the importance of obeying court orders, which also is in the sentencing transcript. Court orders must be obeyed. All those things are there. And the question for this court is whether in light of — — are brought before courts down the street for violating building code orders. Take a guess. I don't expect you to know the exact number. I don't know the answer. How many people are sentenced to the penitentiary? Isn't the reason these people were sentenced to the penitentiary because of the deaths? But I don't think it's a fair argument to make that just because in a different case it's never before happened that someone got a particular sentence, that that is the maximum that can be sentenced in this case. I mean, the Supreme Court in Geiger does not limit the range of the court's discretion to what's been decided before. In fact, as we as courts well aware in sentencing, even two defendants in the same case who do the same conduct can get different sentences. And the fact that one got a higher sentence than the other is not necessarily an abuse of the court's discretion. This court doesn't have to agree that two is the right number. It just cannot be manifestly disproportionate to the nature of the offense. And we submit that in light of the importance of respecting court orders and the extent of the contempt — — they say, well, it was only seven months. Seven months, day in and day out. That's what the sentencing court said. That's a flagrant disregard of the court's authority. That's an important instance to vindicate. And we submit it can't be said that it's outside the range of appropriate discretion for the court to say this needs to be taken seriously as a deterrent in future cases where we're entering orders and building court expressly to protect the public. If the deaths are to be considered and if that's appropriate for the court to consider that in trying to determine the gravity of the offense of the contempt here, I don't think anybody in this courtroom would disagree with you. The question is legally whether it's appropriate to make that leap in light of what the Supreme Court has already said on the subject of proximate cause. You make a very good argument, but I just think it might fall a little bit short. Well, on that last point, Your Honor, I would just say that nothing in the Geiger case says there has to be proximate cause before the consequences are appropriate to consider. In fact, in Geiger itself, the fear that the person who was held in contempt didn't come to pass. He didn't testify, and the fear from not testifying is that the person won't be convicted. The defendant was still convicted even without his testimony. The Supreme Court doesn't say, well, you can't sentence any jail time because what we feared didn't come to pass. No, it was the importance of respecting the court's order about what could have happened. And in this case, respondents, their mindset was no less culpable. They ran the risk people would be killed or injured. In fact, people were killed and injured. Maybe it's not for the reason that they thought, but, you know, when you take your chances, when you disobey court orders, they're there for a reason. If this was the argument that was made before the trial court and the argument that the trial court relied upon, maybe we would have a different case than the one we have before us now, which seems to suggest that the sentencing was based not upon that reasoning that you so eloquently suggest now, but rather on holding people responsible for the deaths that did occur. Well, Your Honor, I mean, I urge you to look at what the sentencing court actually does say, because it doesn't say I'm considering Maybe trust us. Okay. Trust us. I've already agreed, Your Honor. If anything we've said is in the exclusion of the court, let me ask. I apologize if I gave the court that impression. I did not mean to give the court that impression at all. No problem. I just urge, because the court doesn't say I'm considering the deaths. It says I'm considering the serious nature of this, and I'm considering the extent, the extended contempt, and the importance that court orders must be obeyed. So those factors are there, and so we urge not an abuse of discretion. However, if this court were to disagree, we would urge the court to remand for the sentencing court to consider, again, in light of what this court concludes is the appropriate factors after the Supreme Court's decision in Geiger. Finally, I want to briefly address the jury instructions, if the court has questions about those. Briefly, regarding the willful instruction, there is simply nothing that, there's no possibility the outcome would have been different if the jury had only been told that willful means knowing. And there's plenty of waiver-like language here that's been quoted. Correct, Your Honor. Okay. And regarding the corporate liability instruction, that reads, a person is legally responsible for conduct which he performs or causes to be performed, in the name of or on behalf of the corporation. That told the jury to consider what each respondent did himself, what he did. So there's not a possibility. And the second part of it gives out the possibility that if there is a suggestion or a thought that it was done on behalf of a corporation, that doesn't excuse the conduct. Correct. Correct, Your Honor. Unless there are further questions on the remaining issues, we'll rest on our briefs, and we respectfully ask this court to affirm the convictions and the respondent's sentences. Thank you, Your Honor. Thank you. No, no, no. Let's leave the water there. Better not ruin it. Okay. Thank you. Briefly, Your Honors, the Supreme Court, I think, as Your Honors recognize, did not address these issues at all. It was focused on a narrow issue of whether or not the order was sufficiently clear as to permit a conviction. These issues weren't touched on. The instruction and evidentiary issues present the issue of how the trial failed to consider the proper issues and whether the outcome would have been different. Those are issues the court obviously did not consider and didn't touch on. The evidence that was presented we don't believe was cumulative in the sense that this court and, I'm sorry, trial courts all the time allow in both documents and testimony on the documents. The documents themselves are quite important independently, and that's our position, that these documents were independently very important to bolster the testimony of what the people claimed they were. By saying bolster, it's in a sense a tacit acknowledgment, as you have expressly acknowledged, that they otherwise heard about the existence and the actions taken by Mr. Royce in response to those documents. So the question is, once again, was it an abuse of discretion to say you can hear about it one way but you can't see it another, and if so, did it make any difference? That's correct, and we contended it did. I know you do. On sentencing, Your Honors, Geiger mandates a more exacting review by this court of the sentence and the contempt cases. The Supreme Court made clear that the risk of injury was addressed in Welch and Suzuki, which is the two cases we noted are most similar, and also the length of the violations was also an issue there, and neither of them came out the same way this case came out. The deaths were the basis of the sentence, but the deaths aren't actually also the offense to the court. The deaths were not the direct result of the collapse of the roof or the second floor, which is the danger that was associated. Had that occurred, it might have a point here, but that didn't occur. So if a meteor hit the building when it was occupied, according to them, it's causation, therefore sentences are appropriate, and that's not caught in the proper definition of causation in this case, and we'd ask that Your Honors vacate the conviction and the sentence and remand or resentence on your own. Thank you. Thank you. This matter will be taken under advisement, and the decision will be issued in due course, and the cases will not argue. Thank you very much.